# JOHN DOE AGENCY ET AL. *v.* JOHN DOE CORP.

No. 88–1083.   Argued October 2, 1989—Decided December 11, 1989

BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, O'CONNOR, and KENNEDY, JJ., joined. BLACKMUN, J., also filed a separate statement, *post*, p. 158. BRENNAN, J., filed a concurring opinion, *post*, p. 158. STEVENS, J., filed a dissenting opinion, *post*, p. 159. SCALIA, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 160.

*Edwin S. Kneedler* argued the cause for petitioners. On the briefs were *Solicitor General Starr, Acting Solicitor General Bryson, Assistant Attorney General Bolton, Deputy Solicitor General Wallace, Roy T. Englert, Jr., Leonard Schaitman,* and *John C. Hoyle.*

*Milton Eisenberg* argued the cause for respondent. With him on the brief were *Arthur Lazarus, Jr.,* and *John T. Boese.**

JUSTICE BLACKMUN delivered the opinion of the Court.

Once again, we are faced with an issue under the Freedom of Information Act (FOIA or Act), 5 U. S. C. § 552. This time, we are concerned with the Act's Exemption 7, § 552 (b)(7). That provision exempts from disclosure

> "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency con-

---

*\*Patti A. Goldman* and *David C. Vladeck* filed a brief for Public Citizen et al. as *amici curiae* urging affirmance.

ducting a lawful national security intelligence investigation, information furnished by a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual . . . ."

Our focus is on the Exemption's threshold requirement that the materials be "records or information compiled for law enforcement purposes."

## I

Respondent John Doe Corporation (Corporation) is a defense contractor. As such, it is subject to periodic audits by the Defense Contract Audit Agency (DCAA), the accounting branch of the Department of Defense.[1] See 32 CFR §§ 357.2 and 357.4 (1988). In 1978, in connection with an audit, an exchange of correspondence took place between the DCAA and the Corporation concerning the proper accounting treatment of certain costs. The Government auditor, by letter dated May 2 of that year, claimed that the costs should have been charged to identifiable programs instead of to a technical overhead account. About $4.7 million in 1977 costs were discussed. The Corporation, by letter dated July 11, 1978, replied and defended its allocation. App. 22–28. No

---

[1] All the names in the caption of this case—"John Doe Agency" and "John Doe Government Agency," petitioners, and "John Doe Corporation," respondent, are pseudonyms. John Doe Agency, however, is the DCAA, and John Doe Government Agency is the Federal Bureau of Investigation. John Doe Corporation is a private corporation; it tells us, Brief for Respondent 1, n. 1, that its identity is revealed in materials filed under seal with the Court of Appeals.

The Solicitor General's office states, Brief for Petitioners ii; Tr. of Oral Arg. 26, that the Government has no objection to public disclosure of petitioners' names. Accordingly, in this opinion we use the real name of each "Agency." We adhere, however, to the use of respondent's pseudonym.

further action regarding the allocation of those costs was taken by the DCAA or the Corporation during the next eight years.

In 1985, the office of the United States Attorney for the Eastern District of New York instituted an investigation into possible fraudulent practices by the Corporation. A subpoena was issued to the Corporation by a grand jury on February 21, 1986. It requested documents relating to the cost allocation question which was the subject of the 1978 correspondence. On September 30, 1986, the Corporation submitted to the DCAA a request under the FOIA for any documents "that are related in any way to the subject matter" of the 1978 correspondence. *Id.*, at 19. Upon the advice of an Assistant United States Attorney, the DCAA denied the request on November 18, citing Exemptions 7(A) and (E) of the Act. App. 29. Two days later the requested records were transferred to the Federal Bureau of Investigation (FBI). *Id.*, at 92.

On February 3, 1987, the Corporation renewed its FOIA request but this time directed it to the FBI. *Id.*, at 46. That agency denied the request, citing only Exemption 7(A). *Id.*, at 49.

After exhausting its administrative remedies, the Corporation instituted the present litigation, seeking review of the withholding of the requested documents, in the United States District Court for the Eastern District of New York. *Id.*, at 6, 11. In due course, the Corporation moved to compel the preparation of a *"Vaughn* Index."[2]

The Government opposed disclosure, the preparation of the Index, and answers to propounded interrogatories on the

---

[2] *"Vaughn* Index" is a term derived from *Vaughn* v. *Rosen*, 157 U. S. App. D. C. 340, 484 F. 2d 820 (1973), cert. denied, 415 U. S. 977 (1974). The "Index" usually consists of a detailed affidavit, the purpose of which is to "permit the court system effectively and efficiently to evaluate the factual nature of disputed information." 157 U. S. App. D. C., at 346, 484 F. 2d, at 826.

ground that compliance with any of these would interfere with the grand jury proceeding and would provide the Corporation with information that might be useful to it in connection with anticipated criminal litigation. The District Court ordered the Government to prepare a *Vaughn* Index and to answer the interrogatories. It ordered *sua sponte*, however, that this material be submitted to the court for examination *in camera* rather than be given directly to the Corporation. *Id.*, at 62, 66.

After conducting its examination without a hearing, the District Court ruled that petitioners were not required to turn over any of the contested documents to the Corporation. It then dismissed the complaint, stating: "[W]e are satisfied that there is a substantial risk that disclosure of any of this material, the documents, the *Vaughn* index and the answers to [the] interrogatories, would jeopardize the grand jury proceeding." App. to Pet. for Cert. 13a–14a.

The Corporation appealed to the United States Court of Appeals for the Second Circuit. That court reversed and remanded the case. 850 F. 2d 105, 110 (1988). It ruled that the law enforcement Exemption 7, upon which the District Court implicitly relied, did not protect the records from disclosure because they were not "compiled for law enforcement purposes." *Id.*, at 109. It observed that the records "were compiled in 1978, seven years before the investigation began in 1985," *id.*, at 108, and that the 1974 amendments to the Act "make it clear that a governmental entity cannot withhold materials requested under the FOIA on the ground that materials that were not investigatory records when compiled have since acquired investigative significance." *Id.*, at 109. The Court of Appeals acknowledged that compliance with the FOIA may compel disclosure of materials that ordinarily are beyond the scope of discovery in a criminal investigation, and thus may enable a potential defendant to prepare a response and construct a defense to a criminal charge. The court concluded, however, that this concern was more properly ad-

dressed to Congress.[3]  *Ibid.*   The court ruled, nonetheless, that on remand the Government was to be allowed to bring to the District Court's attention "any particular matter that would, if disclosed, expose some secret aspect of the grand jury's investigation."   *Id.*, at 110.

The court refused to stay its mandate; it was issued on November 28, 1988.   App. to Pet. for Cert. 15a.   On remand, the District Court concluded that the Second Circuit's opinion required that the *Vaughn* Index be turned over to the Corporation.   App. 86.   The Court of Appeals on January 10, 1989, refused to stay the District Court's order requiring the furnishing of the Index, *id.*, at 96, but later that same day the Circuit Justice entered a temporary stay pending a response from the Corporation.   On January 30, the Circuit Justice granted a full stay.   See 488 U. S. 1306 (MARSHALL, J., in chambers).

Because of the importance and sensitivity of the issue and because of differing interpretations of the pertinent language of Exemption 7,[4] we granted certiorari.   489 U. S. 1009 (1989).

## II

This Court repeatedly has stressed the fundamental principle of public access to Government documents that animates the FOIA.   "Without question, the Act is broadly conceived. It seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands."   *EPA* v. *Mink,* 410

---

[3] As to this conclusion, see also *North* v. *Walsh,* 279 U. S. App. D. C. 373, 382, 881 F. 2d 1088, 1097 (1989).

[4] See *New England Medical Center Hospital* v. *NLRB,* 548 F. 2d 377, 386 (CA1 1976); *Gould Inc.* v. *General Services Administration,* 688 F. Supp. 689, 699 (DC 1988); *Hatcher* v. *United States Postal Service,* 556 F. Supp. 331 (DC 1982); *Fedders Corp.* v. *FTC,* 494 F. Supp. 325, 328 (SDNY), aff'd, 646 F. 2d 560 (CA2 1980); *Gregory* v. *FDIC,* 470 F. Supp. 1329, 1333–1334 (DC 1979).   See also *Crowell & Moring* v. *Department of Defense,* 703 F. Supp. 1004, 1009 (DC 1989).

U. S. 73, 80 (1973). The Act's "basic purpose reflected 'a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language.'" *Department of Air Force* v. *Rose*, 425 U. S. 352, 360–361 (1976), quoting S. Rep. No. 813, 89th Cong., 1st Sess., 3 (1965). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB* v. *Robbins Tire & Rubber Co.*, 437 U. S. 214, 242 (1978). See also *Department of Justice* v. *Reporters Committee for Freedom of Press*, 489 U. S. 749, 772–773 (1989). There are, to be sure, specific exemptions from disclosure set forth in the Act. "But these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Rose*, 425 U. S., at 361. Accordingly, these exemptions "must be narrowly construed." *Ibid.* Furthermore, "the burden is on the agency to sustain its action." 5 U. S. C. § 552(a)(4)(B).

Despite these pronouncements of liberal congressional purpose, this Court has recognized that the statutory exemptions are intended to have meaningful reach and application. On more than one occasion, the Court has upheld the Government's invocation of FOIA exemptions. See *EPA* v. *Mink, supra; Robbins Tire, supra; Reporters Committee, supra; FBI* v. *Abramson*, 456 U. S. 615 (1982). In the case last cited, the Court observed: "Congress realized that legitimate governmental and private interests could be harmed by release of certain types of information," and therefore provided the "specific exemptions under which disclosure could be refused." *Id.*, at 621. Recognizing past abuses, Congress sought "to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." H. R. Rep. No. 1497, 89th Cong., 2d Sess., 6 (1966). See also *EPA* v. *Mink*, 410

U. S., at 80. The Act's broad provisions favoring disclosure, coupled with the specific exemptions, reveal and present the "balance" Congress has struck.

## III

We have noted above that our focus here is on § 552(b)(7)'s exemption from production of "records or information compiled for law enforcement purposes" to the extent that such production meets any one of six specified conditions or enumerated harms. Before it may invoke this provision, the Government has the burden of proving the existence of such a compilation for such a purpose. In deciding whether Exemption 7 applies, moreover, a court must be mindful of this Court's observations that the FOIA was not intended to supplement or displace rules of discovery. See *Robbins Tire*, 437 U. S., at 236–239, 242; *id.*, at 243 (STEVENS, J., concurring). See also *United States* v. *Weber Aircraft Corp.*, 465 U. S. 792, 801–802 (1984). Indeed, the Court of Appeals acknowledged that this was not a principal intention of Congress. 850 F. 2d, at 108.

As is customary, we look initially at the language of the statute itself. The wording of the phrase under scrutiny is simple and direct: "compiled for law enforcement purposes." The plain words contain no requirement that compilation be effected at a specific time. The objects sought merely must have been "compiled" when the Government invokes the Exemption. A compilation, in its ordinary meaning, is something composed of materials collected and assembled from various sources or other documents. See Webster's Third New International Dictionary 464 (1961); Webster's Ninth New Collegiate Dictionary 268 (1983). This definition seems readily to cover documents already collected by the Government originally for non-law-enforcement purposes. See *Gould Inc.* v. *General Services Administration*, 688 F. Supp. 689, 698 (DC 1988).

The Court of Appeals, however, throughout its opinion would have the word "compiled" mean "originally compiled." See 850 F. 2d, at 109.[5] We disagree with that interpretation for, in our view, the plain meaning of the word "compile," or, for that matter, of its adjectival form "compiled," does not permit such refinement. This Court itself has used the word "compile" naturally to refer even to the process of gathering at one time records and information that were generated on an earlier occasion and for a different purpose. See *FBI* v. *Abramson*, 456 U. S., at 622, n. 5; *Reporters Committee, supra.*

Respondent, too, has used the word "compile" in its ordinary sense to refer to the assembling of documents, even though those documents were put together at an earlier time

---

[5] There is disagreement between the parties as to how the opinion of the Court of Appeals is to be read. Petitioners state that the Second Circuit unequivocally held that a document must originally be compiled for law enforcement purposes in order to qualify for protection under Exemption 7. Brief for Petitioners 15. Respondent disagrees and says: "The court of appeals had no occasion to rule in this case on whether records 'originally compiled' for non-law-enforcement purposes but later recompiled for law-enforcement purposes could meet the threshold requirement of Exemption 7." Brief for Respondent 13–14. Instead, argues respondent, the Court of Appeals merely held that the records in this case were never "compiled" for law enforcement, originally or subsequently, and "no other result was possible based on the facts of this case." *Id.*, at 14.

We agree with petitioners. The Court of Appeals stated:

"In the instant case, the documents requested were generated by [the DCAA] independent of any investigation in the course of its routine monitoring of Corporation's accounting procedures with regard to Corporation's defense contracts. The records were compiled in 1978, seven years before the investigation began in 1985. They were thus not 'compiled for law-enforcement purposes' and are not exempted by Subsection (b)(7)." 850 F. 2d 105, 108–109 (CA2 1988).

The court's use of the word "thus" suggests that it believed a record had to be compiled for law enforcement purposes from the outset in order to be protected by Exemption 7.

for a different purpose. In its FOIA requests of September 30, 1986, and February 3, 1987, respondent asked that the requested materials be furnished as soon as they were available, and that the response to the request "not await a compilation of all the materials requested." App. 21, 47–48. This was a recognition, twice repeated, that the documents having been compiled once for the purpose of routine audits were not disqualified from being "compiled" again later for a different purpose.

We thus do not accept the distinction the Court of Appeals drew between documents that originally were assembled for law enforcement purposes and those that were not so originally assembled but were gathered later for such purposes. The plain language of Exemption 7 does not permit such a distinction. Under the statute, documents need only to have been compiled when the response to the FOIA request must be made.[6]

If, despite what we regard as the plain meaning of the statutory language, it were necessary or advisable to examine the legislative history of Exemption 7, as originally enacted and as amended in 1974, we would reach the same conclusion. JUSTICE MARSHALL, writing for the Court in *Robbins Tire*,

---

[6] In the instant case, it is not clear when compilation took place. The record does disclose that the documents were transferred from the DCAA to the FBI shortly after the DCAA denied the FOIA request. The timing of the transfer, however, was not stressed by the Court of Appeals or treated by that court as dispositive. Instead, as noted above, the Court of Appeals ruled that Exemption 7 was not available because the documents were obtained originally for non-law-enforcement purposes.

While we leave to the lower courts the determination whether these documents were "compiled for law enforcement purposes" when the Government invoked Exemption 7, we do note that the pendency of the grand jury investigation serves to negate any inference that the chronology of this case raises a question about the bona fides of the Government's claim that any compilation was not made solely in order to defeat the FOIA request. See *Goldberg v. United States Department of State*, 260 U. S. App. D. C. 205, 211, 818 F. 2d 71, 77 (1987), cert. denied, 485 U. S. 904 (1988); *Miller v. United States Department of State*, 779 F. 2d 1378, 1388 (CA8 1985).

437 U. S., at 224–236, discussed this legislative history in detail. In its original 1966 form, Exemption 7 permitted nondisclosure of "investigatory files compiled for law enforcement purposes except to the extent available by law to a private party." Pub. L. 89–487, § 3(e)(7), 80 Stat. 251. But the Court in *Robbins Tire* observed: "Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it came time to present their cases." 437 U. S., at 224.

To accommodate these needs, Congress in 1974 amended the Act in several respects. See *id.*, at 226–227. Concern was expressed on the Senate floor that four recent decisions in the United States Court of Appeals for the District of Columbia Circuit had permitted Exemption 7 to be applied whenever an agency could show that the document sought was an investigatory *file* compiled for law enforcement purposes.[7] Congress feared that agencies would use that rule to commingle otherwise nonexempt materials with exempt materials in a law enforcement investigatory file and claim protection from disclosure for all the contents.

The aim of Congress thus was to prevent commingling. This was accomplished by two steps. The first was to change the language from investigatory "files" to investigatory "records." The second was to make the compilation requirement necessary rather than sufficient. As amended, Exemption 7 requires the Government to demonstrate that a record is "compiled for law enforcement purposes" *and* that disclosure would effectuate one or more of the six specified harms. See *Robbins Tire*, 437 U. S., at 221–222, 229–230,

---

[7] The cases were *Weisberg* v. *United States Department of Justice*, 160 U. S. App. D. C. 71, 489 F. 2d 1195 (1973), cert. denied, 416 U. S. 993 (1974); *Aspin* v. *Department of Defense*, 160 U. S. App. D. C. 231, 491 F. 2d 24 (1973); *Ditlow* v. *Brinegar*, 161 U. S. App. D. C. 154, 494 F. 2d 1073 (1974); and *Center for National Policy Review on Race and Urban Issues* v. *Weinberger*, 163 U. S. App. D. C. 368, 502 F. 2d 370 (1974).

235. These changes require consideration of the nature of each particular document as to which exemption was claimed. *Id.*, at 229–230. Evasional commingling thus would be prevented. The legislative history of the 1974 amendments says nothing about limiting Exemption 7 to those documents originating as law enforcement records.

A word as to *FBI* v. *Abramson*, 456 U. S. 615 (1982), is in order. There the Court was faced with the issue whether information originally compiled for law enforcement purposes lost its Exemption 7 status when it was summarized in a new document not created for law enforcement purposes. See *id.*, at 623. The Court held that such information continued to meet the threshold requirements of Exemption 7. But we do not accept the proposition, urged by respondent, that the converse of this holding—that information originally compiled for a non-law-enforcement purpose cannot become exempt under Exemption 7 when it is recompiled at a future date for law enforcement purposes—is true. See Brief for Respondent 20.

This Court consistently has taken a practical approach when it has been confronted with an issue of interpretation of the Act. It has endeavored to apply a workable balance between the interests of the public in greater access to information and the needs of the Government to protect certain kinds of information from disclosure. The Court looks to the reasons for exemption from the disclosure requirements in determining whether the Government has properly invoked a particular exemption. See *e. g.*, *NLRB* v. *Sears, Roebuck & Co.*, 421 U. S. 132, 148–154 (1975). In applying Exemption 7, the Court carefully has examined the effect that disclosure would have on the interest the exemption seeks to protect. *Robbins Tire*, 437 U. S., at 242–243; *Abramson*, 456 U. S., at 625. See also *Department of State* v. *Washington Post Co.*, 456 U. S. 595 (1982). The statutory provision that records or information must be "compiled for law enforcement purposes" is not to be construed in a nonfunctional way.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Statement of JUSTICE BLACKMUN.

I add on my own account a word of caution. Simply because a party is a defense contractor does not mean that all doubts automatically are to be resolved against it and those in any way associated with it. A situation of the kind presented by this case can be abused, and after-the-fact acknowledgment of abuse by the Government hardly atones for the damage done by reason of the abuse. The recent *General Dynamics* case* and the sad consequences for a former National Aeronautics and Space Administration administrator whose indictment was dismissed before trial ("because the Justice Department concedes it ha[d] no case," Washington Post, June 24, 1987, p. A24, col. 1) are illustrative. Petitioners themselves, see Reply Brief for Petitioners 11, "recognize the theoretical potential for abuse." I perceive no abuse in the present case, however, that would make it resemble *General Dynamics*.

JUSTICE BRENNAN, concurring.

I join the Court's opinion. I write separately only to note that the question presented is limited to whether materials gathered for a law enforcement purpose, but not originally created for such a purpose, are "compiled" for law enforcement purposes within the meaning of the Freedom of Information Act. The issue of *when* a document must be "compiled" in order to be exempt from disclosure under Exemption 7, see *ante*, at 153, 155, and n. 6, is not before us today. With

---

*\*General Dynamics Corp.* v. *Department of Army*, Civ. Action No. 86–522–FFF (CD Cal.), filed January 9, 1986. See Washington Post, June 23, 1987, p. A1, col. 1; N. Y. Times, June 23, 1987, p. A1, col. 3; Washington Post, June 24, 1987, p. A24, col. 1 (editorial: "It is hard to understand how this case was brought in the first place").

the understanding that we do not reach this question, I join the Court's opinion.

JUSTICE STEVENS, dissenting.

In order to justify the application of Exemption 7 of the Freedom of Information Act (FOIA), the Government has the burden of demonstrating that a request calls for "records or information compiled for law enforcement purposes." The Government can sustain that burden in either of two ways: (1) by demonstrating that the requested records and information were *originally* compiled for law enforcement purposes, or (2) by demonstrating that even though they had been generated for other purposes, they were subsequently recompiled for law enforcement purposes.

The Court states the correct standard for a "compilation," but then inexplicably fails to apply it to the facts of this case. *Ante*, at 155, n. 6. A compilation is "something composed of materials collected and assembled from various sources or other documents." *Ante*, at 153. It is not sufficient that the Government records or information "could reasonably be expected to interfere with enforcement proceedings." 5 U. S. C. § 552(b)(7)(A). The Exemption is primarily designed to protect law enforcement agencies from requests for information that they have gathered for law enforcement purposes. Therefore, under the FOIA, records or information whose production would interfere with enforcement proceedings are exempt only when, by virtue of their "incorporat[ion] in a law enforcement 'mosaic,'" *Gould Inc.* v. *General Services Administration*, 688 F. Supp. 689, 698 (DC 1988), they take on law enforcement significance. In this case, the proper application of these principles is clear.

It is undisputed that the original FOIA request to the Defense Contract Audit Agency (DCAA) called for documents that had been compiled by that agency for non-law-enforcement purposes and that the documents were still in the possession of the agency at the time the request was received. Indeed, they were still in the DCAA's possession on

November 18, 1986, when the request was denied. The claim that the documents were "compiled" is supported only by a letter stating that the DCAA had been advised by the United States' Attorney's Office that the documents were exempt under the law enforcement Exemption and an averment in an affidavit of counsel that the documents were transferred to the FBI's custody on November 20, 1986, after the Government had invoked the Exemption.*

The Court has repeatedly emphasized, what is explicit in the terms of the FOIA, that "the burden is on the agency to sustain its action." 5 U. S. C. § 552(a)(4)(B); see *ante*, at 152; *Department of Justice* v. *Tax Analysts*, 492 U. S. 136, 142, n. 3 (1989); *Department of Justice* v. *Reporters Committee for Freedom of Press*, 489 U. S. 749, 755 (1989). The basic policy of the Act "is in favor of disclosure." *NLRB* v. *Robbins Tire & Rubber Co.*, 437 U. S. 214, 220 (1978). As I understand the record in this case, the Government has at most established a request by a prosecutor that the requested documents be kept secret and a naked transfer of otherwise nonexempt documents from a civilian agency to the FBI. Such a transfer is not a compilation. That is what I understand to be the Court of Appeals' holding, and I am persuaded that it was entirely correct. The Government has not met its burden under the FOIA and there is no reason why it should be given a second opportunity to prove its case.

I respectfully dissent.

JUSTICE SCALIA, with whom JUSTICE MARSHALL joins, dissenting.

I fear today's decision confuses more law than it clarifies. From the prior opinions of this Court, I had thought that at least this much about the Freedom of Information Act was

---

*The Government also submitted a declaration of an Assistant United States Attorney in response to the Corporation's FOIA action. However, that declaration, which states that the requested documents were compiled by DCAA, also states incorrectly that they had been transferred to the FBI prior to the original FOIA request. App. 61.

clear: its exemptions were to be "narrowly construed." *Department of Justice* v. *Julian,* 486 U. S. 1, 8 (1988); *FBI* v. *Abramson,* 456 U. S. 615, 630 (1982); *Department of Air Force* v. *Rose,* 425 U. S. 352, 361 (1976); cf. *Department of Justice* v. *Reporters Committee for Freedom of Press,* 489 U. S. 749, 773 (1989) (Act mandates "full agency disclosure unless information is exempted under clearly delineated statutory language" (citations and inner quotations omitted)); *Federal Open Market Committee* v. *Merrill,* 443 U. S. 340, 351–352 (1979). We use the same language again today, *ante,* at 152, but demonstrate by our holding that it is a formula to be recited rather than a principle to be followed.

Narrow construction of an exemption means, if anything, construing ambiguous language of the exemption in such fashion that the exemption does not apply. The word "compiled" is ambiguous—not, as the Court suggests (and readily dismisses), because one does not know whether it means "originally compiled" or "ever compiled," see *ante,* at 154–155. Rather, it is ambiguous because "compiled" does not always refer simply to "the process of gathering," or "the assembling," *ante,* at 154, but often has the connotation of a more creative activity. When we say that a statesman has "compiled an enviable record of achievement," or that a baseball pitcher has "compiled a 1.87 earned run average," we do not mean that those individuals have pulled together papers that show those results, but rather that they have *generated* or *produced* those results. Thus, Roget's Thesaurus of Synonyms and Antonyms includes "compile" in the following listing of synonyms: "compose, constitute, form, make; make up, fill up, build up; weave, construct, fabricate; compile; write, draw; set up *(printing);* enter into the composition of etc. *(be a component)."* Roget's Thesaurus 13 (S. Roget rev. 1972).

If used in this more generative sense, the phrase "records or information compiled for law enforcement purposes" would mean material that the Government has acquired or produced for those purposes—and not material acquired or produced

for other reasons, which it later shuffles into a law enforcement file. The former meaning is not only entirely possible; several considerations suggest that it is the preferable one. First of all, the word "record" (unlike the word "file," which used to be the subject of this provision, see Freedom of Information Act Amendments of 1974, Pub. L. 93–502, §2(b), 88 Stat. 1563–1564) can refer to a single document containing a single item of information. There is no apparent reason to deprive such an item of Exemption 7 protection simply because at the time of the request it happens to be the only item in the file. It is unnatural, however, to refer to a single item as having been "compiled" in the Court's sense of "assembled" or "gathered"—though quite natural to refer to it as having been "compiled" in the generative or acquisitive sense I have described.

Secondly, the regime that the Court's interpretation establishes lends itself to abuse so readily that it is unlikely to have been intended. The only other documents I am aware of that can go from being available under FOIA to being unavailable, simply on the basis of an agency's own action, are records containing national defense or foreign policy information. Exemption 1 is inapplicable to records of that description that have not been classified, but it can be rendered applicable, even after the FOIA request has been filed, by the mere act of classification. See, *e. g.*, *Goldberg* v. *United States Department of State*, 260 U. S. App. D. C. 205, 211, 818 F. 2d 71, 77 (1987), cert. denied, 485 U. S. 904 (1988). In that context, however, Congress has greatly reduced the possibility of abuse by providing that the classification must *be proper under criteria established by Executive order.* There is no such check upon sweeping requested material into a "law enforcement" file—which term may include, I might note, not just criminal enforcement but civil and regulatory enforcement as well. See, *e. g.*, *Pope* v. *United States*, 599 F. 2d 1383, 1386 (CA5 1979). I suppose a court could disregard such a "compilation" that has been made in

bad faith, but it is hard to imagine what bad faith could consist of in this context, given the loose standard of need that will justify opening an investigation, and the loose standard of relevance that will justify including material in the investigatory file. Compare *Pratt* v. *Webster*, 218 U. S. App. D. C. 17, 29–30, 673 F. 2d 408, 420–421 (1982) (FBI acts for "'law enforcement purpose[s]'" when its investigation concerns "a possible security risk or violation of federal law" and has "at least 'a colorable claim' of its rationality"), with *Williams* v. *FBI*, 730 F. 2d 882, 883 (CA2 1984) (FBI's investigatory records are exempt from disclosure "whether or not the reviewing judicial tribunal believes there was a sound law enforcement basis for the particular investigation"); cf. *United States* v. *Bisceglia*, 420 U. S. 141, 148–151 (1975) (IRS investigative authority includes power to subpoena bank records even in the absence of suspicion that a particular taxpayer has broken the law); *Blair* v. *United States*, 250 U. S. 273, 282 (1919) (grand jury subpoena cannot be resisted by raising "questions of propriety or forecasts of the probable result of the investigation, or . . . doubts whether any particular individual will be found properly subject to an accusation of crime"). It is particularly implausible that Congress was creating this potential for abuse in its revision of Exemption 7 at the same time that it was adding the "properly classified" requirement to Exemption 1 in order to eliminate the potential for similar abuse created by our decision in *EPA* v. *Mink*, 410 U. S. 73 (1973). The Court's only response is that "[e]vasional commingling . . . would be prevented" by the requirement that a document cannot be withheld under Exemption 7 unless, if disclosed, it "would effectuate one or more of the six specified harms." *Ante*, at 156–157. But that begs the question. Congress did not extend protection to *all* documents that produced one of the six specified harms, but only to such documents "compiled for law enforcement purposes." The latter requirement is readily evaded (or illusory) if it requires nothing more than gathering up documents the Gov-

ernment does not wish to disclose, with a plausible law enforcement purpose in mind. That is a hole one can drive a truck through.

But even if the meaning of "compiled" I suggest is not necessarily the preferable one, it is unquestionably a reasonable one; and that creates an ambiguity; and our doctrine of "narrowly construing" FOIA exemptions requires that ambiguity to be resolved in favor of disclosure. The Court asserts that we have "consistently . . . taken a practical approach" to the interpretation of FOIA, by which it means achieving "a workable balance between the interests of the public . . . and the needs of the Government." *Ante*, at 157. It seems to me, however, that what constitutes a workable balance is Congress' decision and not ours; and that the *un*ambiguous provisions of FOIA are so remote from establishing what most people would consider a *reasonable* "workable balance" that there is no cause to believe such a standard permeates the Act. Consider, for example, FOIA's disequilibrous disposition with regard to information that "could reasonably be expected to endanger the life or physical safety of any individual"—namely, that such information is not withholdable in *all* cases, but only if it has been "compiled for law enforcement purposes." See 5 U. S. C. §552(b)(7)(F). "Workable balance" is not a workable criterion in the interpretation of this law. In my view, a "practical approach" to FOIA consists of following the clear provisions of its text, and adhering to the rules we have enunciated regarding interpretation of the unclear ones—thereby reducing the volume of litigation, and making it inescapably clear to Congress what changes need to be made. I find today's decision most impractical, because it leaves the lower courts to guess whether they must follow what we say (exemptions are to be "narrowly construed") or what we do (exemptions are to be construed to produce a "workable balance").

I respectfully dissent.